IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE, TENNESSEE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JAMES ROBERT JACKSON, JR. | ) | |
| 1181 Neptune Road | ) | Case No. 3:10-bk-08723 |
| Ashland City, TN 37015 | ) | Chapter 11 |
| SSN/ITIN: xxx-xx-1273 | ) | Judge Harrison |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| ALFRED K. NIPPERT, JR., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. _____ |
| | ) | |
| JAMES ROBERT JACKSON, JR. | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT

Comes now Plaintiff, Alfred K. Nippert, Jr. ("Mr. Nippert"), and requests that the Court declare the debts of Debtor/Defendant James Robert Jackson, Jr. ("Mr. Jackson") owed to Mr. Nippert non-dischargeable pursuant to 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6). Mr. Jackson used his various business entities as alter-egos and instrumentalities to commit a fraud against Mr. Nippert and this Court. Mr. Jackson fraudulently induced Mr. Nippert to make loans to one of those companies, then caused the company to default on the loans, misappropriated company funds for his own use, transferred significant company assets to a new company he formed in secret, and transferred his only remaining real asset — the goodwill of his insurance agency — to his ex-wife in satisfaction of her claim for a non-dischargeable alimony obligation and to secure a promotion for his son. Mr. Jackson should not be permitted to escape his obligations to

1

Case 3:11-ap-00074   Doc 1   Filed 02/01/11   Entered 02/01/11 11:01:23   Desc Main
Document      Page 1 of 18

Mr. Nippert because of his gross misconduct. Mr. Nippert seeks a declaration that Mr. Jackson's debt to him is non-dischargeable and further seeks damages for fraud, breach of fiduciary duty and wrongful conversion of funds. In support of his adversary complaint, Mr. Nippert states as follows:

## I. Parties

1. Mr. Nippert is an individual domiciled in Ohio.

2. Mr. Jackson is domiciled in Tennessee. He resides in Ashland City, Cheatham County, Tennessee.

3. Mr. Jackson is the sole proprietor of a horse farm known as Stonewall Farm. He has been the sole or controlling shareholder and an officer and director in KCA Enterprises, Inc.; Jackson, Denney and Davis, Inc.; and Jackson Place, Inc.; assisted in the formation of and served as the registered agent for service of process for SDJ, LLC; holds an interest to an unknown extent in Stonewall Investments, Inc.; and held an interest to an unknown extent in Perry-Jackson Holdings, LLC. *None* of Mr. Jackson's interests, transfers of interests, and/or roles as an officer, director, shareholder or member in KCA Enterprises, Inc., Jackson, Denney and Davis, Inc., Jackson Place, Inc., SDJ, LLC; Stonewall Investments, Inc. or Perry-Jackson Holdings, LLC, were disclosed in Mr. Jackson's Statement of Financial Affairs.

## II. Jurisdiction and Venue

4. This is an adversary proceeding in Mr. Jackson's Case No. 3:10-bk-08723 under Chapter 7 of Title 11 of the United States Bankruptcy Code, now pending in this Court. This Court has jurisdiction of this core proceeding according to 28 U.S.C. § 157(b).

5. This Adversary Proceeding constitutes a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(I).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

7. This Adversary Proceeding is commenced pursuant to Rule 7001(6) of the Federal Rules of Bankruptcy Procedure. Further, this Adversary Proceeding is brought pursuant to, among other sections, 11 U.S.C. §§ 548 and 523(a)(2), (4) and (6).

### III. Factual Allegations

**A. Mr. Jackson's Fraudulent Inducements to Obtain Loans.**

8. Prior to his bankruptcy, Jackson held a controlling interest in KCA Enterprises, Inc. ("KCA") and was responsible for the day-to-day operations of KCA from its inception until it ceased doing business in February 2009. Jackson owned twenty-five and one-half percent (25.5%) of the shares in KCA as a result of his divorce from Angela Jackson and retained voting rights as to fifty-one percent (51%) of the shares. At various times, Mr. Jackson has claimed to own fifty-one percent (51%), seventy-five percent (75%) and ninety-one percent (91%) of the shares in KCA.

9. From April 18, 2000, through January 1, 2003, Mr. Jackson caused KCA to obtain multiple loans from Mr. Nippert, memorialized by eighteen (18) separate Demand Promissory Notes. Copies of the Demand Promissory Notes are attached hereto as <u>Collective Exhibit 1 (the "Loans")</u>.

10. On December 10, 2002, Mr. Jackson caused KCA to execute and deliver to Mr. Nippert a Security Agreement that granted Mr. Nippert a security interest in, among other things, all of KCA's interest in equipment, fixtures, inventory and receivables. KCA was authorized to enter the Security Agreement by a Resolution of the board of directors of KCA that was adopted on December 10, 2002. Copies of the Security Agreement and the Resolution are attached

hereto as <u>Collective Exhibit 2</u>.  At no time did Mr. Jackson tell Mr. Nippert that KCA's purported board of directors did not exist.

11. In order to induce Mr. Nippert to make the Loans, Mr. Jackson showed Mr. Nippert the KCA Shareholders' Agreement identifying the shareholders in KCA.  A true and correct copy of the Shareholders' Agreement is attached hereto as <u>Exhibit 3</u>.  Mr. Jackson knew that the other shareholders identified in the Shareholders' Agreement had not contributed capital to the formation or operation of KCA, had no involvement in KCA, and did not serve as officers and directors of KCA.  Mr. Jackson fraudulently and/or recklessly misrepresented the involvement of these shareholders and the existence of additional shareholders to Mr. Nippert in order to present KCA as a larger and more diverse corporation than it actually was, and to falsely represent that KCA functioned as a corporation rather than as Mr. Jackson's alter ego.  Mr. Nippert relied to his detriment on Mr. Jackson's intentional and fraudulent misrepresentations.

12. As further inducement to convince Mr. Nippert to loan funds, Mr. Jackson assured Mr. Nippert that Mr. Jackson's primary income resulted from his ownership and operation of an insurance agency known as Jackson, Denney and Davis, Inc. ("JDD"), for which he served as the principal broker and which he had operated successfully for more than a decade.  Mr. Jackson represented to Mr. Nippert that the income Mr. Jackson earned from JDD made a salary or other compensation from KCA unnecessary.  Mr. Jackson agreed to build the business of KCA for the purposes of acquisition by another company or reaching a future agreement with Mr. Nippert for Mr. Jackson to repurchase Mr. Nippert's shares if Mr. Nippert agreed to invest in KCA.

13. After Mr. Nippert began making loans to KCA, Mr. Jackson immediately began directing KCA funds to himself and his other business interests, as more specifically set forth below, and contrary to the representations that he had made to induce the Loans.

### B. Mr. Jackson Uses KCA's Operating Account as His Personal Checkbook, and KCA Files Bankruptcy.

14. As more fully set forth in the Amended Complaint styled *Nippert v. Jackson* and filed with the U.S. Bankruptcy Court for the Middle District of Tennessee under Case Number 3:09-cv-1068, Mr. Jackson was the alter ego of and conspired with KCA to benefit himself at the expense of Mr. Nippert, to embezzle funds from KCA for his own personal benefit, and to use KCA as an instrumentality of fraud to the detriment of Mr. Nippert.

15. Mr. Jackson controlled KCA and other business entities and used those entities as alter-egos and instrumentalities to commit a massive fraud against Mr. Nippert, KCA's other creditors, and this Court. As President and controlling shareholder of KCA, Mr. Jackson acted as the alter ego of KCA in the following ways:

    A. Mr. Jackson grossly undercapitalized KCA.

    B. Mr. Jackson failed to issue stock certificates for KCA.

    C. Mr. Jackson has stated, under oath, that any identification of KCA officers other than himself was merely "window dressing" because he was "the only one that operated the company."

    D. KCA held no board meetings.

    E. KCA held no shareholder's meetings.

    F. KCA issued no annual reports to shareholders.

    G. Mr. Jackson failed to recommend and/or adopt bylaws for KCA.

    H. When Mr. Jackson terminated Doug Hammond as an employee and shareholder of KCA, he did not re-allocate Mr. Hammond's outstanding shares of stock.

    I. Mr. Jackson controlled the decisions of KCA and used the business to further his own interests to the detriment of other shareholders such as Mr. Nippert.

J. Mr. Jackson failed to maintain arms-length transactions among or between his businesses, Stonewall Farm, KCA, JDD and Jackson Place, and himself. Mr. Jackson used the various business entities in which he had a controlling interest to benefit himself without regard for corporate forms.

K. Mr. Jackson claimed to be, and to all appearances was, the majority shareholder in KCA. As such, Mr. Jackson owed a fiduciary duty to Mr. Nippert as a minority shareholder. Mr. Jackson was obligated to deal fairly with Mr. Nippert and not to act out of avarice, malice or self-interest. Mr. Jackson failed to honor his fiduciary duties.

L. Mr. Jackson acted with avarice, malice or self-interest in the discharge of his duties as the majority shareholder of KCA by using the assets of KCA to benefit himself at the expense of Mr. Nippert, by diverting KCA assets to pay personal obligations such as a debt for his personal vehicle, his alimony or marital property settlement obligations, to pay certain obligations of Mr. Jackson Place, Inc. with KCA funds, by disposing of corporate assets without compensation to the corporation or its shareholders and without their consent or authorization, by diverting cash paid by vendors of KCA to his own use and benefit rather than the benefit of KCA and by disposing of corporate assets in unauthorized transactions designed solely to benefit Mr. Jackson at the expense of Mr. Nippert.

16. Mr. Jackson used KCA's operating account as his personal bank account to benefit himself and his other business interests. More specifically:

A. Mr. Jackson used KCA funds to pay a salary to his son, Kyle Robert Jackson, whom Mr. Jackson has stated under oath did not work for KCA and had no

6

involvement in KCA. Instead, Kyle Robert Jackson worked for his father as an insurance broker with JDD. Mr. Jackson paid his son's salary with KCA funds solely to benefit himself and his wholly-owned corporation, JDD.

    B.    Mr. Jackson employed many of the same employees for KCA as he employed for himself for work at Stonewall Farm. Upon information and belief, Mr. Jackson paid employees at Stonewall Farm using KCA funds. On January 5, 2009, KCA's bookkeeper, Ina Louallen, requested that Mr. Jackson provide the social security numbers for "the farm boys" so that KCA could issue federal tax Form 1099s to the employees actually performing work for Stonewall Farm. Mr. Jackson's payment of his farm hands with KCA funds for work performed at Stonewall Farm, and his payment of Ina Louallen's salary with KCA funds when she was actually performing bookkeeping work for Stonewall Farm, perpetrated a fraud upon Mr. Nippert and the other shareholders of KCA.

    C.    Mr. Jackson used KCA to enrich himself personally. Mr. Jackson used the corporate assets of KCA to pay the debt for his 2006 Dodge 3500 pick-up truck, to register and make payments on a BMW that he and/or his wife owned personally, to pay a marital or alimony obligation in the form of a mortgage payments on behalf of Jackson Place, Inc., and to pay his girlfriend's travel expenses. Upon information and belief, Mr. Jackson's use or conversion of additional corporate assets of KCA solely for his personal benefit will be discovered during the course of this litigation.

    D.    Mr. Jackson caused KCA to write checks to "Cash" which he then endorsed for his own use and benefit. Mr. Jackson had no legitimate business purpose when he caused KCA to issue checks to "Cash."

7

Case 3:11-ap-00074    Doc 1    Filed 02/01/11    Entered 02/01/11 11:01:23    Desc Main
Document      Page 7 of 18

E. Mr. Jackson fraudulently diverted or attempted to divert the corporate assets of KCA to himself or his other business entities to the detriment of Mr. Nippert. Upon information and belief, Mr. Jackson sold KCA merchandise from his personal residence known as Stonewall Farm without accounting to KCA for the proceeds of the sales and in violation of KCA's contractual agreements with The Collegiate Licensing Company. In addition, Mr. Jackson sold KCA merchandise to vendors who were not licensed by the Collegiate Licensing Company to sell such merchandise.

F. Mr. Jackson fraudulently attempted to sell the corporate assets of KCA without providing for the payment of KCA's debt to and eventual judgment in favor of Mr. Nippert. Mr. Jackson made communications to a potential buyer in an attempt to sell KCA without payment of KCA's debt to Mr. Nippert, evidencing Mr. Jackson's intent to fraudulently avoid the debt to Mr. Nippert.

G. Mr. Jackson prepared or caused to be prepared Balance Sheets and Income Statements for KCA that included a debt owed by Jackson Place, Inc., which is a corporation controlled by Mr. Jackson. The debt paid by KCA on behalf of Jackson Place, Inc. was not owed by KCA, but Mr. Jackson caused the debt to be repaid with KCA funds.

H. Mr. Jackson willfully failed and refused to disclose the financial condition of KCA to Mr. Nippert or his counsel, or to provide a financial accounting of KCA to Mr. Nippert, in order to conceal his fraudulent conduct from Mr. Nippert for as long as possible. Mr. Jackson admonished KCA's bookkeeper, Ina Louallen, to "only discuss any financials with me [Jackson] in order to prevent the wrong person from doing or saying the wrong thing at the wrong time."

8

I. Mr. Jackson obtained payments on behalf of KCA and failed to account for the cash properly in KCA's books and records. On December 1, 2008, Ina Louallen, KCA's bookkeeper, emailed Mr. Jackson and asked whether he intended to bring her the cash payment that he had received, advised Mr. Jackson that she was holding cash for him and asked whether she should deposit the cash she had on hand. Mr. Jackson responded that he did not intend to bring to her the cash that he had been paid and, rather than instructing Ms. Louallen to deposit the cash payments in KCA's account, he confirmed that Ms. Louallen should "write the petty cash off to samples, bad debt, or whatever." Mr. Jackson's fraudulent use and misuse of KCA's corporate assets to benefit himself damaged Mr. Nippert as a shareholder and creditor of KCA.

17. As the controlling shareholder of KCA, Mr. Jackson siphoned corporate funds to his own use and benefit and the benefit of at least one of his other businesses, JDD. Mr. Jackson diverted funds from KCA to JDD by writing checks from KCA's account to JDD and describing the transfers as "loans" or "loan repayment." A copy of a check from KCA to JDD containing the description "loan payment" is attached hereto as <u>Exhibit 4</u>. KCA did not make loans to or receive loans from JDD, and the transfers effected by Mr. Jackson from KCA to JDD were solely for his personal benefit.

18. In addition to transferring KCA funds to benefit JDD, and in addition to the transfers described above, Mr. Jackson also used KCA funds to pay personal expenses such as his American Express account charges. A copy of certain checks from KCA to American Express in payment of Mr. Jackson's outstanding account balance is attached hereto as <u>Collective Exhibit 5</u>.

19. Mr. Jackson used KCA as his personal bank account for his vehicle payments, using KCA funds to pay his monthly lease payment for a BMW and later to make his ongoing monthly

9

Case 3:11-ap-00074   Doc 1   Filed 02/01/11   Entered 02/01/11 11:01:23   Desc Main
Document      Page 9 of 18

truck payments for a 2006 Dodge 3500 pickup truck. A copy of two checks from KCA as payment to Regional Acceptance for Mr. Jackson's monthly truck payment is attached hereto as Exhibit 6.

20. Mr. Jackson caused KCA to transfer funds to Stonewall Investments, Inc., which is a business that co-owned horses with Mr. Jackson's Stonewall Farm, and transferred other KCA funds to Stonewall Farm as a "loan." A copy of a check from KCA to Stonewall Investments, Inc. is attached hereto as Exhibit 7 and a copy of KCA's check to Stonewall Farm is attached hereto as Exhibit 8.

21. As a result of Mr. Nippert's Loans, KCA enjoyed greater purchasing power and was able to expand beyond its original line of collegiate-licensed merchandise. However, Mr. Jackson directed KCA's use of its funds far beyond simple business expenses. And although KCA enjoyed a six-figure cash flow during many months, it was able to make only one payment toward the Loans from 2000 until its bankruptcy in 2009.

22. As KCA experienced continuing growth and increased sales, Mr. Nippert made repeated demands for payments and accountings on the Loans, including on August 15, 2005. Despite Mr. Nippert's demands, KCA made only one payment, and Mr. Jackson and KCA refused to provide an accounting to Mr. Nippert.

23. On June 11, 2007, Mr. Nippert filed a Complaint against KCA in the U.S. District Court for the Southern District of Ohio, Western Division, under Case Number 1:07CV460, for breach of the Demand Promissory Notes. On November 1, 2008, the court entered an Amended Agreed Entry Granting Judgment to Plaintiff, Alfred K. Nippert, Jr., in the amount of $2,933,459.17 plus attorneys' fees and interest at the contractual rate of 10% per annum from November 1, 2008. A copy of the Agreed Judgment is attached hereto as Exhibit 9.

24. KCA made no payments to satisfy Mr. Nippert's Agreed Judgment.

25. Mr. Jackson caused KCA to file a chapter 7 bankruptcy petition in this Court on April 24, 2009, under Case Number 3:09-bk-04629.

26. KCA's duly appointed chapter 7 trustee abandoned the debtor's interest in property of the estate by notice entered on June 10, 2009. The trustee neither received any property nor paid any money on behalf of KCA's bankruptcy estate.

27. In connection with KCA's bankruptcy petition, Mr. Jackson fraudulently certified under penalty of perjury, as President of KCA, that he owned fifty-one percent (51%) of the stock of KCA. Mr. Jackson's statement regarding his percentage of ownership was false, and Mr. Jackson knew the statement was false at the time that he made it. A copy of KCA's Statement of Financial Affairs misrepresenting Mr. Jackson's ownership share in KCA is attached hereto as <u>Exhibit 10,</u> and a copy of KCA's Declaration Under Penalty of Perjury on Behalf of Corporation or Partnership, signed by Mr. Jackson, is attached hereto as <u>Exhibit 11</u>.

28. In connection with KCA's bankruptcy petition, Mr. Jackson fraudulently stated that KCA had held a board meeting on April 9, 2009, at which the KCA board of directors determined that KCA would file a bankruptcy petition. In fact, KCA did not hold a board meeting on April 9, 2009 for any purpose, nor did the board of directors of KCA authorize the filing of a petition in bankruptcy then or otherwise.

29. Mr. Jackson made the fraudulent statements as to the purported April 9, 2009, board meeting in the Corporate Resolution in support of KCA's bankruptcy petition. A copy of KCA's Corporate Resolution is attached hereto as <u>Exhibit 12</u>. He made these statements with the knowledge that the statements were false and with the willful intent to defraud Mr. Nippert and the U.S. Bankruptcy Court.

30. Mr. Jackson failed to disclose on KCA's bankruptcy statements and schedules that he had stored hundreds of boxes of KCA merchandise worth thousands of dollars at his personal residence, and had stored KCA office equipment and records at his personal residence and the offices of JDD.

### C. Mr. Jackson Forms Another Company in Secret and Causes KCA to Transfer Funds to It.

31. In 2005, Mr. Nippert escalated his demands that KCA repay the Loans or open its books and records for inspection.

32. Unbeknownst to Mr. Nippert, at the same time he was making demands for repayment or accounting, Mr. Jackson was using KCA to create a business entity, SDJ, LLC, to which he then caused KCA to write checks for "commissions" totaling tens of thousands of dollars per check. A copy of SDJ, LLC's business formation documents filed with the Tennessee Secretary of State's office, showing KCA as one of two members of SDJ, LLC and Mr. Jackson as the registered agent for service of process, is attached hereto as Exhibit 13.

33. Mr. Jackson failed to disclose to Mr. Nippert, KCA's largest shareholder and largest creditor, that he had caused KCA to form a company that would be receiving significant transfers of money from KCA, and that he served as the registered agent for service of process for the company to which KCA was transferring funds.

34. In contrast to the minimal salary of approximately $3,000 per month that Mr. Jackson had directed KCA to pay KCA's previous sales representative, Mr. Jackson directed KCA to transfer to SDJ, LLC as much as $60,000 in one month. A copy of certain checks from KCA to SDJ, LLC is attached hereto as Exhibit 14.

### D. Mr. Jackson Transfers His Primary Asset to Benefit His Son and Ex-Wife.

35. During the course of the litigation pending in District Court, and less than one year before filing the instant bankruptcy case, Mr. Jackson transferred his interest in JDD and Jackson Place, Inc. to his ex-wife, Angela Jackson. In addition to Angela Jackson, the transfer benefitted Mr. Jackson's son, Kyle Robert Jackson, who had worked under his father's direction in JDD and, following Mr. Jackson's transfer of his interest in JDD to Angela Jackson, received a promotion to become JDD's primary broker.

36. Although Mr. Jackson had earned a six-figure income for years from his work as an insurance broker with JDD, Mr. Jackson received no actual monetary compensation for the transfer of his goodwill and other valuable interest in JDD to Angela Jackson. Moreover, Mr. Jackson failed to disclose the transfer on his Statement of Financial Affairs, which he signed under oath and filed with this Court on August 18, 2010. A copy of Mr. Jackson's Statement of Financial Affairs is attached hereto as Exhibit 15.

37. By transferring his interest in JDD to benefit his ex-wife and son, Mr. Jackson satisfied an otherwise non-dischargeable domestic support obligation to Angela Jackson.

38. Mr. Jackson's failure to disclose the transfer of his interest in JDD and Jackson Place, Inc. was brought to his attention at his Meeting of Creditors. Mr. Jackson acknowledged that he had failed to disclose the transfers, but he has never amended his statements and schedules to disclose truthful information.

39. As a result of the transfer of his interest in JDD, Mr. Jackson's income has dropped from over $120,000 per year in 2006, 2007 and 2008, or approximately $10,000 per month for a period of at least three years, to $381.99 for the month of December, 2010.

40. Mr. Jackson's transfer of a valuable asset during the pendency of litigation, to or for the benefit of insiders, without adequate consideration for the transfer, for the purpose satisfying a non-dischargeable obligation to the detriment of his other creditors, demonstrates Mr. Jackson's willingness to commit fraudulent acts, and more particularly demonstrates the lengths to which he will go to hinder, defraud or delay Mr. Nippert's collection of the debt owed to him.

41. Mr. Nippert timely filed a proof of claim in Mr. Jackson's bankruptcy case, a copy of which is attached hereto as Exhibit 16.

## IV.  CLAIMS FOR RELIEF

### First Claim for Relief pursuant to 11 U.S.C. § 523(a)(2)

42. Mr. Nippert reasserts and realleges the facts and allegations in the above paragraphs as if set forth herein verbatim.

43. Mr. Jackson obtained money and property through material misrepresentations that he knew were false or that were made with gross recklessness.  As set forth above, Mr. Jackson made false representations and material misrepresentations of fact upon which Mr. Nippert relied to his detriment and that were the proximate cause of Mr. Nippert's damages.

44. Specifically, at the time Mr. Jackson induced Mr. Nippert to make the Loans to KCA, Mr. Jackson misrepresented the involvement of shareholders and the existence of additional shareholders to Mr. Nippert in order to present KCA as a larger and more diverse corporation than it actually was.

45. Mr. Jackson knew that the other shareholders identified in the Shareholders' Agreement had not contributed capital to the formation or operation of KCA and had no involvement in KCA, and he intended to deceive Mr. Nippert with his material misrepresentations.

14

46. Mr. Jackson further represented to Mr. Nippert that Mr. Jackson's compensation from JDD was sufficient and that he did not intend to take a salary or receive other compensation from KCA. Upon KCA's receipt of the Loans, Mr. Jackson promptly began making transfers of KCA funds to himself or for his benefit.

47. Mr. Jackson's representations to Mr. Nippert were materially false and were made with the knowledge that the representations were materially false at the time they were made or with reckless disregard for their falsity.

48. Mr. Jackson's materially false representations involved his financial condition – he represented that he did not need a salary or other compensation from KCA and that his compensation from JDD was sufficient – and also involved the corporate structure and ongoing operations of KCA.

49. Mr. Jackson intended for Mr. Nippert to rely on Mr. Jackson's fraudulent representations.

50. Mr. Nippert actually and justifiably relied on Mr. Jackson's false representations and that reliance proximately caused Mr. Nippert's losses.

51. Mr. Jackson published the false representations to Mr. Nippert with the intent to deceive him.

52. Mr. Jackson's actions have damaged Mr. Nippert for which he is entitled to compensation in an amount to be proven at trial.

53. For the foregoing reasons, Mr. Jackson's liability to Mr. Nippert is not dischargeable pursuant to 11 U.S.C. § 523(a)(2).

**Second Claim for Relief pursuant to 11 U.S.C. § 523(a)(4)**

54. Mr. Nippert repeats and realleges the facts and allegations in the above paragraphs as

if set forth herein verbatim.

55. As the president and majority shareholder of KCA, Mr. Jackson owed a fiduciary duty to KCA and to Mr. Nippert. While acting in his fiduciary capacity, he misappropriated and/or failed to properly account for KCA property and funds. Further, Mr. Jackson obtained KCA funds and property through embezzlement.

56. Mr. Jackson, as the president and holder of the right to vote a majority of the shares of KCA, was entrusted with KCA assets, including Loans from Mr. Nippert, KCA receivables, KCA inventory and KCA equipment. Mr. Jackson misappropriated these funds and property for his personal use. Mr. Jackson's actions constitute a breach of his fiduciary duty to KCA and to Mr. Nippert.

57. Mr. Jackson misappropriated these funds and property with fraudulent intent and/or deceit, as evidenced by the facts recited above, including, among other things, correspondence with KCA's bookkeeper and Mr. Jackson's misrepresentations in connection with the KCA bankruptcy proceedings. Mr. Jackson's fraudulent intent and deceit may also be inferred from his attempted sale of KCA without repayment of indebtedness to Mr. Nippert.

58. Mr. Jackson's misappropriation and failure to properly account for KCA funds and property have harmed Mr. Nippert by unfairly depriving Mr. Nippert of the true value of his investment in KCA and by preventing the repayment of loans from Mr. Nippert.

59. As set out above, Mr. Jackson used KCA, JDD and Jackson Place, among others, to carry-out a fraudulent purpose against Mr. Nippert and his other creditors, and engaged in substantial self-dealing, all in an attempt to hinder, defraud and delay his creditors and KCA's creditors.

60. For the foregoing reasons, Mr. Jackson's liability to Mr. Nippert is not dischargeable

pursuant to 11 U.S.C. § 523(a)(4).

61. Mr. Jackson's intentional fraudulent, malicious, and wrongful conduct in breach of his fiduciary duties warrants the imposition of punitive damages.

### Third Claim for Relief pursuant to 11 U.S.C. § 523(a)(6)

62. Nippert repeats and realleges the facts and allegations in the above paragraphs as if set forth herein verbatim.

63. Mr. Jackson willfully and maliciously caused injury to Mr. Nippert in converting KCA funds and property for his own use. Mr. Jackson appropriated KCA funds, merchandise, equipment, and cash receivables for his own use and benefit in exclusion or defiance of the rights of KCA creditors and shareholders, including Mr. Nippert.

64. As of April 24, 2009, Mr. Jackson owned or possessed certain tangible and intangible assets, including funds from the unauthorized sales of KCA merchandise and certain KCA merchandise that was not disclosed to KCA's bankruptcy trustee.

65. Upon information and belief, Mr. Jackson intentionally appropriated and converted KCA's property for his own use and benefit in defiance of Mr. Nippert's right in and to the property.

66. Mr. Jackson's conversion of the assets and property of KCA to his own use and benefit has damaged Mr. Nippert, for which Mr. Nippert is entitled to compensation in an amount to be proven at trial.

67. Mr. Jackson further attempted to hinder, defraud or delay Mr. Nippert's rights as a creditor when Mr. Jackson conveyed his interest in JDD to Angela Jackson, for herself and the benefit of his son, Kyle Jackson.

68. For the foregoing reasons, Mr. Jackson's liability to Mr. Nippert is not dischargable

under 11 U.S.C. § 523(a)(6).

## V. PRAYER FOR RELIEF

WHEREFORE, Mr. Nippert respectfully requests that the Court enter judgment against Mr. Jackson as follows:

(a) Declaring that Mr. Jackson's indebtedness to Mr. Nippert is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and/or (a)(6);

(b) Granting Mr. Nippert a non-dischargeable judgment in an amount to be determined, including, without limitation, prejudgment and post-judgment interest as provided by law, reasonable attorneys' fees, costs and expenses;

(c) Awarding Mr. Nippert judgment against Mr. Jackson for punitive damages in an amount to be proven at trial;

(d) Taxing costs to Mr. Jackson; and

(e) Granting Mr. Nippert any other and further relief to which he may be entitled.

Respectfully submitted,

LAWSON LAW OFFICE, PLLC


/s/ Jennifer A. Lawson_____
Jennifer A. Lawson (BPR # 014937)
Lawson Law Office, PLLC
343 Harrison Street
Nashville, TN 37219
Telephone: (615) 847-5350
Facsimile: (615) 847-5351
Email: jlawson@lawsonlawoffice.com